IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STEPHANI KAY BAUERNFEIND,

              Plaintiff,

    v.

KILOLO KIJAKAZI[1],
Acting Commissioner of Social Security,

              Defendant.

OPINION AND ORDER

20-cv-495-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Stephani Kay Bauernfeind seeks judicial review of a final decision of defendant, Commissioner of the Social Security Administration, finding plaintiff not disabled within the meaning of the Social Security Act. Plaintiff contends that the administrative law judge (ALJ) erred by: (1) failing to properly evaluate her claim that she could not work because of frequent fainting and lightheadedness; (2) failing to adopt certain findings made by a state agency consulting psychologist; and (3) failing to demand a "cogent" explanation from the vocational expert about how he arrived at his estimated job numbers before accepting the expert's testimony. After reviewing the record, I am not persuaded that any of the issues identified by plaintiff warrant remand. Therefore, the commissioner's decision will be affirmed.

---

[1] The court has changed the caption to reflect Kilolo Kijakazi's recent appointment as acting commissioner.

1

BACKGROUND

In 2016, plaintiff, then 29, applied for disability insurance benefits, asserting that she had been unable to work since 2012 because of several medical impairments that cause fainting, lightheadedness, blurry vision, weakness, difficulty concentrating and an elevated heart rate. Plaintiff's voluminous medical records show that since at least 2012, she has had a been diagnosed with postural orthostatic tachycardia syndrome (POTS), a disorder of the autonomic nervous system in which the blood vessels fail to constrict when the person stands upright. This causes blood to pool excessively below the heart, which in turn causes symptoms such as lightheadedness, brain fog, heart palpitations and fatigue. See https://www.hopkinsmedicine.org/health/conditions-and-diseases/postural-orthostatic-tachycardia-syndrome-pots (last visited Sept. 20, 2021). A number of mental impairments, including depression, anxiety and a personality disorder, were also diagnosed.

After the local disability agency denied her claim initially and on reconsideration, plaintiff requested an administrative hearing, which was held via videoconference on February 25, 2019 before ALJ Margaret Carey. Plaintiff was represented by counsel and testified at the hearing. The ALJ also heard testimony from Thomas Gusloff, an impartial vocational expert, whose qualifications plaintiff accepted without a challenge. AR 43-44. At the hearing, plaintiff said she could not work because her low blood pressure prevented her from sitting for long periods, she could only stand for a few minutes, and she passed out every day. AR 55. She said that if she "fully" passed out, she would have to lie down for 20 minutes before getting up, but if she lay down before passing out, she would only have to lie

down for 10 minutes before she could get up again. As for sitting, plaintiff said she could sit for about 20 minutes before having to lie down flat. AR 56. Plaintiff said that she was able to care for her four year old daughter by preparing meals in advance, "cook[ing] on the ground," and relying on help from her family and her daughter's father, with whom she lives. AR 57.

The ALJ asked vocational expert Gusloff to consider a hypothetical person with plaintiff's age, education, and work history, who could perform sedentary work with the following limitations: no climbing of ladders, ropes or scaffolds; occasional crawling; no exposure to unprotected heights or hazardous machinery; no driving; performing only simple, routine, repetitive tasks that could be learned through short, simple instructions; a low-stress environment, meaning one with few changes in the work setting and few work-related decisions; no interaction with the public; and only occasional, routine, and superficial interaction with coworkers. AR 64, 65. In addition, the person was required to wear compression stockings. AR 65. It was Gusloff's opinion that such a person could not perform any of plaintiff's past relevant work but could perform the following jobs, as listed in the Dictionary of Occupational Titles (DOT): (1) addresser, of which there were 25,000 jobs nationally; (2) document preparer, 30,000 jobs nationally; and (3) final assembler, 50,000 jobs nationally. AR 65-66.

When asked on cross-examination to explain how he arrived at his job numbers, Gusloff testified as follows:

> They are estimates that are derived from the U.S. Bureau of Labor Statistics. My method would be to look at the jobs that I've selected. Well, starting with

> that, I select jobs that I know are found in the economy. And that's based on my experience with job placement over the past 30 plus years. Then I would select a job. I would look at the numbers that are published by the U.S. Bureau of Labor Statistics. But they generally would publish figures for a grouping of – or several different DOT titles. So my method would be to look at the composition of the group, and based on my knowledge of the labor market, I would weigh the different jobs between themselves and come up with a – what I would feel a reasonable estimate, based on the numbers that are published.

AR 69. Gusloff explained that the "grouping of DOT" codes to which he referred was the Standard Occupational Classification (SOC) codes. AR 70. He further explained that his method was not necessarily the same for each job because "[e]ach job occurs in the economy in a different way:"

> [F]or instance, a cleaner/housekeeper is found in a grouping of – I think of nine occupations. So I would look at the composition of those nine that are in there. And they have things like a domestic laundry worker, a second butler, a caretaker. And it also has a cleaner/housekeeper, a cleaner for hospitals, and a cleaner for hotel and restaurants. And I can tell you, based on my experience, that the jobs such as cleaner/housekeeper, that could be found in any industry, and the cleaner, hospital, and the cleaner for the hotel and restaurant, would be much more prevalent than a second butler, an ironer, a laundry worker, domestic. So that's how I base my – it's based on my knowledge. So I would weigh those more heavily. In that particular group, there's 922,660 jobs. So what I've done is I've weighed the cleaner/housekeeper fairly heavily in that group, compared to the other ones, and I estimated 200,000 cleaner/housekeepers across the nation. It's not exact. It's an estimate.

AR 69. Gusloff explained that his experience included working with individuals in job placement and vocational counseling for 30 plus years, as well as sitting in thousands of hearings. He acknowledged that his past work in job placement typically did not require knowledge of the number of jobs that might exist in the national economy, but he nevertheless thought his job estimates were reasonably reliable. AR 70-71. Plaintiff

4

disagreed, and objected to the ALJ's reliance on Gusloff's job incidence numbers on the ground that they were not reliable. AR 71.

In a May 16, 2019 decision, the ALJ found that plaintiff was not disabled. AR 21-35. Applying the five-step sequential process for evaluation disability claims, 20 C.F.R. § 404.1520, the ALJ determined that: (1) plaintiff had not worked during the claim period; (2) she had the severe impairments of postural orthostatic tachycardia syndrome, anxiety disorder, depressive disorder, and personality disorder; (3) none of these impairments, whether considered singly or in combination, was severe enough to be presumptively disabling; (4) her impairments prevented her from performing her past relevant work; and (5) she was able to make a vocational adjustment to a number of jobs existing in significant numbers in the national economy. As a predicate to her findings at steps four and five, the ALJ found that plaintiff retained the residual functional capacity to perform a reduced range of sedentary work, with the additional limitations she had asked Gusloff to consider at the hearing. AR 23, 26.

In assessing plaintiff's residual functional capacity, the ALJ reviewed plaintiff's reports of her symptoms, including her claims of fainting one to five times a day. Although the ALJ accepted that plaintiff's POTS could reasonably be expected to cause her reported symptoms, she found plaintiff's allegations regarding the alleged frequency and intensity of those symptoms inconsistent with the medical record and other evidence. AR 27. These inconsistencies included: (1) in spite of plaintiff's "robust treatment history" including numerous clinic and emergency room visits, the only time any provider clinically observed

one of her reported fainting episodes was during a tilt table test in January 2012; (2) in late October 2017, plaintiff told a health provider that her symptoms had begun at age 17 or 18 and had been generally *declining* in severity over the years, yet plaintiff had engaged in substantial work activity in her early 20s; and (3) plaintiff had a "significant history of treatment non-compliance," which included stopping medications on her own because of alleged side effects, failing to wear compression stockings even though plaintiff reported no passing out episodes for the four months when she wore them, and missing numerous appointments without calling her clinicians in advance or rescheduling the appointment. AR 28-30.

Relying on Gusloff's testimony, the ALJ found that plaintiff's limitations prevented her from performing her past relevant work as an administrative clerk, cleaner, or secretary, but would allow her to adjust to certain other sedentary, unskilled jobs including addresser, document preparer and final assembler. AR 33. Finally, the ALJ found that these jobs existed in significant numbers in the national economy. Although plaintiff objected to Gusloff's job numbers testimony, the ALJ concluded Gusloff had sufficient foundation for his testimony and that his job estimates were reliable in light of his training and experience. AR 34. The Appeals Council denied plaintiff's appeal and plaintiff filed this appeal.

## OPINION

The question before this court whether the ALJ's decision is supported by substantial evidence, that is, "sufficient evidence to support the agency's factual determinations."

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). The threshold for sufficiency is not high; the substantial evidence standard requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. The ALJ must identify the relevant evidence and build a "logical bridge" between that evidence and the ultimate determination. Moon v. Colvin, 763 F.3d 718, 721 (7th Cir. 2014).

Plaintiff challenges the ALJ's decision on three grounds. She contends that the ALJ erred by: (1) failing to make a proper evaluation of plaintiff's subjective symptoms; (2) failing to adopt certain findings made by a state agency consulting psychologist; and (3) failing to demand a "cogent" explanation from vocational expert Gusloff about how he arrived at his estimated job numbers before accepting the expert's testimony. (She contends in her brief that the ALJ "played doctor" by finding that plaintiff had greater limitations than those found by the state agency doctors. However, plaintiff did not focus on that issue, but instead attacked only the ALJ's credibility finding. Therefore, I will limit my discussion to that issue and find that plaintiff waived her argument that the AL"played doctor." Krell v. Saul, 931 F.3d 582, 587, n.1 (7th Cir. 2019) (finding waiver of "brief and undeveloped"argument).)

### A. Subjective Symptoms

An ALJ's findings about a plaintiff's testimony and allegations regarding her symptoms are entitled to great deference, and should be upheld unless patently wrong. Summers v. Berryhill, 864 F.3d 523, 528 (7th Cir. 2017). An ALJ is required only to give

reasons sufficient to provide a fair sense of how the ALJ assessed plaintiff's testimony and statements. Social Security Ruling (SSR) 16-3p. Moreover, the ALJ does not need to explain why each of the claimant's statements deserved little weight. Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012). The court reads the decision as a whole to determine whether the ALJ adequately supported the subjective-symptom evaluation. Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2014). Not all of the ALJ's reasons have to be sound as long as enough of them are. Halsell v. Astrue, 357 Fed. Appx. 717, 722-723 (7th Cir. 2009).

Plaintiff contends the ALJ made a number of misstatements about the evidence that had the effect of understating the severity of her POTS symptoms. First, she argues that the ALJ ignored numerous echocardiograms showing heart abnormalities. Contrary to plaintiff's argument, however, the ALJ expressly recognized that "some [of plaintiff's echocardiograms] have at times been consistent with POTS and shown some abnormalities including premature atrial complexes and a premature ventricular complex," and that providers at times noted tachycardia as well. AR 28. More important, the ALJ *accepted* plaintiff's claim that she has POTS and a "documented history of heart rate and rhythm irregularities at times." AR 30. What the ALJ did not fully accept were plaintiff's subjective statements regarding the frequency and severity of her POTS-associated symptoms. The additional evidence of abnormal echocardiograms cited by plaintiff has little bearing on that issue.

Plaintiff next argues that the ALJ overstated the significance of plaintiff's having no observed losses of consciousness during a four-day hospital stay in June 2014. Plaintiff argues that this evidence is irrelevant to the credibility of her complaints concerning her

8

POTS symptoms because the purpose of her hospital stay was to monitor for epileptic activity, not for POTS symptoms.  Plaintiff further points out that plaintiff was noted to have a rapid heartbeat when she got up to use the restroom, which was consistent with an episode of POTS.  AR 1816.  As the ALJ noted, however, plaintiff's rapid heartbeat was the only abnormality recorded during that four-day stay.  Given plaintiff's reports of passing out one to five times daily, it was reasonable for the ALJ to find it significant that plaintiff had no such episodes during a four-day period when she was under observation in a clinical setting, regardless why she was being observed.  Further, the ALJ also properly noted that no clinical evidence of an episode was detected during plaintiff's many visits to her doctors or the emergency room.  Contrary to plaintiff's assertion, two emergency room notes stating "Neuro:  positive for syncope" are not objective clinical findings, but rather are noted in the "Review of Symptoms" portion of the report where the examiner records the patient's subjective symptoms.  AR 1863, 1939.  Overall, the ALJ did not err in finding little objective evidence to support the alleged severity and frequency of plaintiff's symptoms.

Plaintiff next argues that in finding her non-complaint with treatment recommendations, the ALJ violated Social Security Ruling 16-3p, which provides that an ALJ must consider an individual's reason for not complying with prescribed treatment before rejecting her symptoms on that basis.  Plaintiff argues that in criticizing her failure to wear her compression stockings, the ALJ failed to consider that they did not fit at times because of weight gain.  However, the ALJ discussed this in her decision, noting that plaintiff had offered various excuses for not wearing the stockings, including that they caused certain side

9

effects, were uncomfortable, did not fit or were hard to put on. At the same time, however, the ALJ noted that plaintiff's cardiologist told her the stockings would not cause the purported side effects; she had been fitted numerous times for different variations of the stockings; and she reported no losses of consciousness during the four months when she wore the stockings regularly. AR 29. Giving the ALJ's decision the deference it is due, I cannot say the ALJ erred in questioning the validity of plaintiff's reasons for not wearing her compression stockings, particularly when they prevented the very symptoms that plaintiff says prevent her from working.

Finally, plaintiff raises no challenge to the ALJ's finding that plaintiff's past work activity, during a time period when she reported her symptoms were worse, was inconsistent with her claims of total disability. This finding, combined with plaintiff's apparent half-hearted efforts to manage her symptoms with compression stockings and the dearth of objective evidence to support her claims that she passed out multiple times a day, amply supports the ALJ's determination that plaintiff's allegations concerning the severity and frequency of her syncopal episodes could not be fully credited. Accordingly, plaintiff is not entitled to a remand on this basis. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008) ("When assessing an ALJ's credibility determination, we do not . . . undertake a de novo review of the medical evidence that was presented to the ALJ. Instead, we merely examine whether the ALJ's determination was reasoned and supported.").

## B. Mental Limitations

As noted above, the ALJ found that plaintiff had the severe mental impairments of anxiety, depression and a personality disorder. Reviewing the record, the ALJ noted that plaintiff had obtained psychiatric treatment and therapy for many years for these conditions, was taking Lexapro since at least 2012, and mental status examination at times showed deficits in mood and affect and decreased psychomotor activity. AR 30. Otherwise, however, mental status examinations generally showed no clinical abnormalities, including no deficits in "memory, perception, insight, judgment, thought processes, or grooming and no suicidal or homicidal ideation." AR 30. The ALJ noted one instance after plaintiff's date last insured when she presented in the emergency room after reportedly getting angry with her boyfriend and threatening to harm herself or others, but noted she was discharged after telling providers she had made a comment she should not have and would not harm herself or others. AR 31. The ALJ explained that she accommodated plaintiff's difficulties getting along with others by finding that plaintiff could not interact with the public and could only interact with coworkers occasionally. With respect to plaintiff's "reported mood and affect deficits as well as the alleged difficulty concentrating/completing tasks," the ALJ found that plaintiff was limited to performing "simple, routine, repetitive tasks in a low-stress environment, defined as having few if any changes in the work setting and few if any work related decisions." AR 31. In addition, the ALJ found that all tasks had to be learned through short, simple instructions. Id. The ALJ noted that these mental work-related limitations were "slightly greater" than those found by the state agency reviewing

psychologists, whose opinions she found only partially supported by the objective medical evidence. AR 31.

Plaintiff argues that, in spite of purporting to assign greater limitations than the state agency psychologists had found, the ALJ actually appears to have assigned lesser restrictions than found by state agency consultant Esther Lefevre, Ph.D. In particular, plaintiff contends that the ALJ did not account for certain "moderate" limitations found by Lefevre on the "checkbox" portion of the Mental Residual Functional Capacity Assessment "(MRFC") form she completed when reviewing plaintiff's disability application. Specifically, when rating plaintiff's "sustained concentration and persistence limitations" on the form, Lefevre found that plaintiff had moderate limitations on her ability to: (1) "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" and (2) "complete a normal workday and workweek without interruptions from her symptoms and to perform at a consistent pace." See AR 80-81. However, when asked to describe plaintiff's sustained concentration and persistence capacities "in narrative form," Lefevre wrote: "Her anxiety makes it difficult for her to concentrate and complete tasks at times. She is able to care for her daughter currently as a single mother." AR 81. Overall, Lefevre concluded that plaintiff could "perform unskilled work with moderate limitations throughout." AR 76.

Although nothing in Lefevre's narrative description of plaintiff's ability to concentrate and persist at tasks suggests greater mental limitations than the ALJ found, plaintiff insists that Lefevre's narrative is flawed because Lefevre did not "encapsulate" all of the moderate

12

restrictions from the checkbox section of the form or explain their exclusion. I disagree. As other courts in this district have found, neither the agency's Programs Operations Manual System nor the Court of Appeals for the Seventh Circuit demands a one-to-one correlation between a state agency consultant's narrative and any "moderate" limitations she identified on the checkbox section of the MRFC form. See Baumann v. Saul, No. 20-CV-11-WMC, 2020 WL 7237921, at *4-5 (W.D. Wis. Dec. 9, 2020) ("[A] Section III narrative need not specifically name and discuss each Section I finding in order to adequately 'encapsulate' those findings"); Pytlewski v. Berryhill, No. 17-CV-0810-SLC, 2018 WL 5729736, at *8 (W.D. Wis. Nov. 2, 2018) (same), aff'd, Pytlewski v. Saul, 791 F. App'x 611 (7th Cir. 2019) (same). For example, in Johansen v. Barnhart, 314 F.3d 283, 285-86 (7th Cir. 2002), the court found no error by the ALJ in relying on a state agency consultant's conclusion that the claimant could perform "repetitive, low-stress work" even though, as in this case, the consultant had found on the checklist that the claimant was "moderately limited" in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Similarly, in Capman v. Colvin, 617 Fed. App'x 575, 579 (7th Cir. 2015), the court saw no inconsistency between the examiner's checklist finding that Capman was moderately limited in his ability to complete a day or week of work without interruption and his narrative conclusion that Capman could adequately manage the stress of unskilled tasks.

As in those cases, state consultant Lefevre's conclusion that plaintiff would have some moderate limitations in certain abilities related to sustained concentration and persistence is not inconsistent with her conclusion that plaintiff could perform unskilled work, but would have problems concentrating and completing tasks "at times" because of her anxiety. As the commissioner points out, a person who has a "moderate" ability to function in a certain area is not precluded from performing that task. SSA, Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 66164 (Sept. 26, 2016) (effective January 17, 2017) (clarifying that a "moderate" limitation means that a claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair."); Capman, 617 Fed. App'x at 579 ("A moderate limitation is not a complete impairment.") (citing Roberson v. Astrue, 481 F.3d 1020, 1024 (8th Cir. 2007)). I am satisfied that, by restricting plaintiff to simple, routine, repetitive tasks that can be performed in a low-stress environment and can be learned through short, simple instructions, the ALJ reasonably accommodated the limitations identified as "moderate" by the state agency consultants and supported by the evidence in the record. Moreover, apart from Lefevre's checklist findings, plaintiff fails to identify any other evidence that would support greater restrictions than the ALJ found, nor does she suggest what those restrictions would be. For these reasons, plaintiff has failed to demonstrate any reason to remand this case for a new residual functional capacity assessment. Accord Jozefyk v. Berryhill, 923 F.3d 492, 498 (7th Cir. 2019) ("It is unclear what kinds of work restrictions might address Jozefyk's limitations in concentration, persistence, or pace because he hypothesizes none); Loveless v. Colvin, 810 F.3d 502, 508

14

(7th Cir. 2016) ("Loveless does not identify medical evidence that would justify further restrictions.").

### C. Step Five Challenge

Finally, plaintiff challenges the ALJ's reliance on the vocational expert's number estimates for the three jobs that she found plaintiff could perform. In Chavez v. Berryhill, 895 F.3d 962 (7th Cir. 2018), the court of appeals held that the ALJ's reliance on a vocational expert's job estimates is based on substantial evidence only if the job estimates are the "product of a reliable method." Id. at 968. While this is not an "overly exacting standard," and there is no requirement of a specific method for approaching this approximation, whatever method the commissioner uses to estimate job numbers "must be supported with evidence sufficient to provide some modicum of confidence in its reliability." Id. at 968-69.

In Chavez, the court found this threshold had not been met because the vocational expert did not explain why he used job estimates produced by the oft-criticized "equal distribution method," which "operates on the illogical assumption that all job titles within a particular DOT job group exist in equal numbers in the national economy," id. at 966, rather than the much lower estimates produced by a software program that used an "occupational density method." Id. As the court explained:

> When pressed four times to explain why he chose the estimates produced by the equal distribution method over those from the JobBrowser Pro software, the VE focused entirely on the latter method's shortcomings, testifying that "it's almost logical" that there exist more than 800 bench assembler jobs in the

15

> national economy. Perhaps so. But concluding that one approach is flawed does not demonstrate that another method is reliable. Our confidence in the VE's methodology is further diminished by his later concession that he was "not sure that either one of the methods give a very accurate count on numbers." An affirmative explanation for the estimates he produced was required, for without one there was no evidentiary foundation on which the ALJ could rest a finding of reliability. The transcript leaves us with the conviction that the VE mechanically relied on outdated sources to estimate job numbers, without bringing any aspect of his extensive experience to bear on the reality of those numbers. We are left with the possibility that the job-number estimates were conjured out of whole cloth.

Id. at 969–70 (internal quotations and citations omitted). The court explained that before accepting the vocational expert's job numbers, the ALJ should have required him to provide "a reasoned and principled explanation" for his estimate, which he could have done, for example, by "draw[ing] on his past experience with the equal distribution method, knowledge of national or local job markets, or practical learning from assisting people with locating jobs throughout the region, to offer an informed view on the reasonableness of his estimates." Id. at 970.

More recently, in Brace v. Saul, 970 F.3d 818 (7th Cir. 2020), the court revisited the reliability requirement. There, as in this case, the vocational expert did not use the "equal distribution" method but instead "weighted" the jobs within a particular Standard Occupational Classification [SOC] category to arrive at his estimates. Id. at 821. When asked to explain his method, however, the expert responded:

> Well, it's—it's that combination of, one, you are looking at the number of titles that are in [an SOC category] [,] and then based upon the—my information that I have as far as how the frequency of those jobs are performed, then we do an allocation based upon weighting or re-weighting those allocations to get the estimates of the numbers.

16

Id. at 822. Not surprisingly, the court found this "entirely unilluminating" testimony insufficient to meet the substantial evidence standard, noting that the expert did not explain the weighting process, identify what "information" he had that supposedly informed that process, or otherwise provide a cogent and thorough explanation of his method. Id.

Plaintiff argues that vocational expert Gusloff's testimony in this case suffers from the same flaws the court identified in Brace. I am not persuaded that it does, although the question is a close one. Whereas the vocational expert in Brace offered *no* explanation of his weighting methodology, stating merely that it was based on "information that [he had]," here Gusloff explained that, in estimating how to distribute the SOC numbers across the various DOT jobs grouped in a particular SOC category, he drew from his 30 years' experience in placing individuals in jobs and "knowledge of the labor market" gained from that experience. Thus, although acknowledging that his numbers were not exact, Gusloff did not accept blindly the Bureau of Labor's numbers or rely on the faulty "equal distribution" method criticized in Chavez and other cases, nor did he offer unintelligible jargon like that given by the vocational expert in Brace. Rather, he applied his extensive experience and knowledge of the labor market in a logical manner to arrive at his job estimates. Crude though it may have been, this method appears, at least under Chavez, to provide enough "modicum of confidence" in the expert's job estimates such that the ALJ could reasonably rely on them in making her step five determination. Accord Chavez, 895 F.3d at 970 (noting that expert could offer "informed view on the reasonableness of his estimates" by drawing on his knowledge of national or local job markets or practical learning from assisting

17

people with locating jobs throughout the region). Because the VE's testimony makes clear that he had a reasonable, articulable basis for his job estimates and they were not "conjured out of whole cloth," plaintiff is not entitled to a remand for a new step five determination.

## ORDER

IT IS ORDERED that the that the decision of defendant Kilolo Kijakazi, Acting Commissioner of Social Security, is AFFIRMED and plaintiff Stephani Kay Bauernfeind's appeal is DISMISSED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 20th day of September, 2021.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge